Harold Eugene **ROGERS**, Petitioner,

v.

**R. G. BRITTON and James Mabry, Respondents.**

**No. PB–C–77–0071.**

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Sept. 27, 1979.

---

## OPINION

ARNOLD, District Judge.

This is a habeas corpus case challenging petitioner's conviction of first-degree rape and the sentence of life imprisonment imposed in accordance with the verdict of the jury. On March 7, 1979, this Court filed an opinion upholding the validity of the conviction. *Rogers v. Britton*, 466 F.Supp. 397 (E.D. Ark.1979). The Court did not reach the question of the constitutionality of the sentence under the Eighth and Fourteenth Amendments. The Court held that petitioner had not exhausted his State remedies with respect to that issue. Petitioner was directed to file an application for post-conviction relief with the Supreme Court of Arkansas. The petition was held in this Court for possible further action pending the outcome of petitioner's application to the Supreme Court.

Petitioner then applied to the Supreme Court of Arkansas for leave to proceed under R.Crim.P. 37.2(a). That Court denied permission in an opinion issued on June 11, 1979. *Rogers v. State*, 265 Ark. 945, 582 S.W.2d 7 (1979) (per curiam) (en banc). The Court held that this Court had been mistaken in characterizing petitioner's sentence as "life imprisonment without parole." It pointed out that petitioner's sentence was life imprisonment *simpliciter*, and that, while the sentence was not initially subject to parole because of Ark.Stat.Ann. § 43–2807, it could later become subject to parole if the Governor should commute it to a term of years by executive clemency. The Court then rejected petitioner's argument that, under the circumstances of this case, a jury not given the benefit of any standards or guidelines could not validly impose a life sentence. The Court did not undertake to

analyze the system of jury sentencing, or justify the absence of standards as a matter of due process. It simply held that the sentence was valid because it was "within the statutory limits . . . . The constitutional prohibition of cruel and unusual punishment is directed toward the kind of punishment, not its duration. . . . As we stated in our original opinion, *Rogers v. State*, [257 Ark. 144, 156, 515 S.W.2d 79, 87 (1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975)] . . . 'if a sentence is within the limits established by the legislature, it is valid even though it is insisted that the punishment is unconstitutionally excessive.'" 265 Ark. at 958, 582 S.W.2d at 13. Cases involving the death penalty were distinguished on the ground that the death penalty is unique. "If the penalty assessed against petitioner is too severe under the facts of the case, it is a matter that addresses itself to executive clemency and not to this Court." *Id.* at 961, 582 S.W.2d at 15.

Petitioner, having thus clearly exhausted his State remedies, returned to this Court. On June 26, 1979, he filed a supplemental application for relief, again contesting the validity of his sentence under the Eighth and Fourteenth Amendments. Two briefs in support of the application have been filed, one on July 16, 1979, and one on September 5, 1979. Respondents have filed no opposition, apparently desiring to rest on their previous briefs, which fully address the issues.

It is now this Court's duty to decide the question on which it earlier deferred to the Supreme Court of Arkansas. The facts of the case recited in this Court's previous opinion will not be repeated *in extenso.* Suffice it to say that petitioner, a 17-year-old black, was tried and convicted for the forcible rape of a 21-year-old white woman. No permanent injury, physical or psychological, was done to the victim apart from the rape itself, so far as this record discloses. Petitioner had no prior criminal record. The jury was given no instructions or standards to guide its sentencing discretion. The jury fixed punishment at life imprisonment, and the trial court imposed sentence accordingly.

■ A word should be said at the outset about this Court's earlier characterization of the sentence as life without parole. The Supreme Court of Arkansas is the final and authoritative arbiter of questions of the interpretation of Arkansas statutes. Its decisions on such questions are binding on this and every other court. It points out that the law of Arkansas does actually create the punishment of life without parole, but that this phrase is limited to capital cases. In such cases, a defendant sentenced to life without parole may never be released except by executive clemency alone. Even if the sentence is commuted by the Governor to a term of years, the defendant does not become eligible for parole, however much time he may have served. See Ark.Stat. Ann. §§ 41–4701, –4702, –4703, –4707 (Supp. 1973) (Act 438 of 1973). Commutation cannot effect the release of a prisoner unless the commutation is to time served. Otherwise, the defendant must serve out the full term of years to which his sentence has been commuted. The range of punishments available for the crime of rape (which is no longer a capital offense) is somewhat different. At the time of Rogers's conviction, the sentence for first-degree rape could be anywhere from 30 years to life. If the sentence is life (as it was here), it is not subject to parole unless executive clemency is first obtained. Ark.Stat. Ann. § 43–2807(b)(1). If the sentence is commuted, and if a defendant has served one-third of the newly fixed term of years, the defendant becomes immediately eligible for parole.

■ It is quite true, therefore, that petitioner's sentence was not "life without parole" in the same sense that the Arkansas capital-felony statutes use that phrase. A defendant convicted of a capital felony and sentenced to "life without parole" can never be paroled. He can be released only if he is pardoned or if he serves out the entire term of years to which his sentence has been commuted. A defendant convicted of rape and sentenced to "life," however, can be

released on parole if he is first made eligible by executive commutation. The distinction undoubtedly exists, but the fact remains that this petitioner must serve the rest of his natural life in prison unless some Governor favors him with some form of clemency. However frequent commutations may be in practice, the fact remains that they are by definition acts of grace, bestowed on no fixed basis and according to no ascertainable standards. They are manifestations of mercy, not of the operation of law. The possibility of their occurrence in any given case is not measurable. For federal constitutional purposes, therefore, it is fair to say that in petitioner's case life means life.

Was the sentence validly imposed in this case? Petitioner does not argue, and this Court would not hold if he did, that life imprisonment for rape is *per se* cruel and unusual punishment. Rape is a violation of the person that must be abhorrent to everyone, and it is deserving of the severest censure. There are cases of rape for which life imprisonment is entirely appropriate, even required by justice. Indeed, a legislature might make a judgment that rape in and of itself is so heinous that it should always be punished by life imprisonment. This Court is not saying that such a judgment would be impermissible under the Federal Constitution. There is no occasion to speculate on that question, because the General Assembly of Arkansas does not view all rapes as equally reprehensible, not even all first-degree rapes. At the time of Rogers's trial, a broad range of punishments was available—30 years to life. The General Assembly obviously thought that some rapes were more blameworthy than others, and that juries would make the appropriate distinctions in fixing punishments case by case.[1]

The rub is that the jury in this case was given no guidance in making these distinctions. It was left completely at large, as

this Court's prior opinion notes. The jury simply announced its verdict as to punishment, giving, of course, no reasons, and was then discharged—an ad hoc body whose reasons for imposing the maximum sentence on petitioner can never be known, and whose decision cannot be rationalized even by reference to some set of standards that were presumably applied. For the legislature has provided no standards. We cannot know, and the jury could not know, what weight, if any, the General Assembly might have assigned to the defendant's youth, the fact that he used a gun, the absence of aggravated injury, the lack of a prior record, or any other aggravating or mitigating circumstances. We do know that petitioner could have received no greater punishment had he been of full age, had the victim been maimed for life, and had petitioner been guilty of previous rapes.

Some light is thrown on the problem by death-penalty cases like *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). There was no opinion of the Court, but its judgment was announced in an opinion by Mr. Justice Stewart, joined by Powell and Stevens, JJ. The principles announced in this opinion controlled the outcome in *Gregg* and several companion cases, so lower courts can properly look to the opinion for guidance. The opinion is significant for present purposes because it discusses in full the question of sentencing discretion:

> . . . where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

428 U.S. at 189, 96 S.Ct. at 2932. Discretion must be exercised in an informed manner. This is especially necessary when juries have the sentencing power, because jurors

---

1. This remains the legislative judgment, although the General Assembly has, since the trial and conviction in this case, further reduced the penalties for rape. Section 1803 of Act 280 of 1975, the Criminal Code, Ark.Stat. Ann. § 41-1803, defines rape (of which there are now no degrees) as "a class A felony," the penalty for which is "not less than five (5) years nor more than fifty (50) years, or life." Ark.Stat.Ann. § 41-901(1)(a).

are not trained in such matters and may never before have made a sentencing decision. Guidance should be given the jury about the factors that the State deems relevant to the sentencing decision. Standards to guide jury sentencing are not impossible to formulate. "In summary, the concerns . . . that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Id.* at 195, 96 S.Ct. 2935. A death penalty imposed by "a system of standardless jury discretion violates the Eighth and Fourteenth Amendments." *Id.* at 196 n. 47, 96 S.Ct. at 2936. In other words, in the view of these three Justices—which continues, in general, to be the prevailing view on the Supreme Court, see, *e. g., Lockett v. Ohio*, 438 U.S. 586, 600–01, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion of Burger, C. J., joined by Stewart, Powell and Stevens, JJ.)—the death penalty is not *per se* unconstitutional, but it *is* invalid unless accompanied by the proper procedures and standards.

Does this analysis have any application in a noncapital context? There is a passage in the plurality opinion of the Chief Justice in *Lockett, supra,* that, if read broadly and literally, would give a clear answer of "no" to that question. The opinion says that "legislatures remain free to decide how much discretion in sentencing should be reposed in the judge or jury in noncapital cases . . . . We recognize that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes." 438 U.S. at 603, 604–05, 98 S.Ct. at 2964–65. After careful reflection, this Court is persuaded that its analysis cannot stop with these quotations. For one thing, the portion of the opinion from which the quotations are taken (as is so often the case in this difficult area) was not joined by a majority of the Court. Second, the remarks are only *dicta,* not necessary to the resolution of the capital case that was before the Court in *Lockett.* And finally, it is difficult to believe that the

statements were meant to receive their full literal force. There are surely *some* kinds of exercise of discretion in noncapital cases that States could not validly allow their sentencing authority. If a judge or jury, for example, explicitly imposed a sentence because of the race of the defendant, or the victim, or both, no one would argue that the sentence should stand, no matter how broad the sentencing authority's discretion in general.

That the death sentence is unique cannot be gainsaid. It does differ in kind from all other sentences. Life in prison is unique, too, however, and it also, though not so severe as the irreversible sentence of death, differs in kind from all other, lesser sentences of imprisonment, including a sentence of life imprisonment with a fixed parole-eligibility date. "In most jurisdictions, a sentence to be imprisoned for life now stands in the place where the death penalty stood earlier in this century—the ultimate punishment imposed by this society for those crimes most abhorrent to it." *Rummel v. Estelle,* 568 F.2d 1193, 1196 (5th Cir. 1978) (2–1 decision), *rev'd on rehearing en banc,* 587 F.2d 651 (5th Cir. 1978) (8–6 decision), *remanded on another issue,* 590 F.2d 103 (5th Cir. 1979) (per curiam), *cert. granted,* —— U.S. ——, 99 S.Ct. 2403, 60 L.Ed.2d 1064 (1979). In addition, Eighth Amendment jurisprudence is not limited simply to an examination of the kind or quality of the sentence imposed. A term of imprisonment can be invalid simply because it is so long as to be grossly disproportionate to the nature of the offense. *E. g., Ingraham v. Wright,* 430 U.S. 651, 667, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). Just as the decision to sentence an accused to death instead of life imprisonment has Eighth Amendment implications, so does the decision to sentence him to life imprisonment rather than, say, 30 years. As the Supreme Court remarked in *Weems v. United States,* 217 U.S. 349, 367, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910), an early Eighth Amendment case, "it is a precept of justice that punishment for crime should be graduated and proportioned to offense." The Constitution

may not require the same degree of exactitude when the sentence imposed is permanent loss of liberty, rather than loss of life. It does not follow that the States are left wholly at large when it comes to the procedures they must follow in order validly to put away an accused forever.

*Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), is also instructive. In that case a death sentence was reversed because the trial court relied on information in a presentence report, part of which was not disclosed to counsel. The judgment of the Court was announced by Mr. Justice Stevens in an opinion joined by Stewart and Powell, JJ. (The same three Justices whose views controlled in *Gregg.*) The opinion first adverts to the uniqueness of the death penalty. It then goes on:

> Second, it is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause.

430 U.S. at 358, 97 S.Ct. at 1204.[2] This portion of the opinion does not appear to be limited to capital cases, and indeed there is no reason why it should be. Very likely the kind of process that is due when life itself is at stake will be more exacting, but that is another question. "The defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence," *ibid.*, even if that sentence is "only" for life. *Cf. Brown v. Parratt*, 560 F.2d 303, 304 (8th Cir. 1977) ("the *Furman* rationale of freakishness is limited *primarily* to cases involving the death penalty") (emphasis supplied).

The Supreme Court has clearly laid down the analytical framework for considering this kind of issue. In *Parham v. J. L.*, —— U.S. ——, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), the Court said:

> Assuming the existence of a protectible property or liberty interest, the Court has required a balancing of a number of factors:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Smith v. OFFER*, 431 U.S. 816, 847–848, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977).

We turn to an examination of those factors in this case.

*First.* Much has already been said of the nature of the petitioner's private interest. Certainly it is a "liberty interest" that transcends most, if not all, others. Petitioner has his life, but very little else. In the calculus of constitutional values petitioner's loss is among the most grievous that a person can suffer.

*Second.* The procedures used here created a high risk of an erroneous determination. The jury was given no guidance whatever on the question of punishment, by contrast with the careful instructions it was given on the issue of guilt or innocence. It could have considered anything, even forbidden racial factors. Feeling in the community was understandably high. The sentence meted out was the most severe available under the law, although the individual circumstances of the case seemed to place it at the lower end of the spectrum of culpability. The trial judge had power under Ark.Stat.Ann. § 43–2310, quoted in this Court's first opinion, to reduce the sentence, and could have applied his own informed judicial discretion and experience to the question. He did not do so and appears to have thought that he had no discretion to vary the jury's verdict. Statutory sentencing standards, communicated to the jury by the court, could have substantially reduced

---

2. Mr. Justice Brennan, dissenting in part, agreed with the plurality opinion that the procedures used in *Gardner* violated the Due Process Clause of the Fourteenth Amendment. 430 U.S. at 364, 97 S.Ct. 1197.

the risk of error. The jury could still have secretly disregarded them, but the whole premise of the system of trial by jury, a premise amply backed by experience, is that jurors are conscientious and make a genuine effort to obey instructions. The instructions could at least have given the jurors a framework for deliberation and debate in the jury room. The jury might still have returned a life sentence, but at least the defendant and the public would have had some assurance that it was based on intelligible and neutral principles.

*Third.* Requiring the articulation and application of sentencing standards before a verdict of life imprisonment is returned would impose some additional burden on the State. Judges and lawyers will have to take some additional time to discuss and draft jury instructions on the issue of punishment. Jurors will be limited in their deliberations to some extent. But the freedom of the jury to express the conscience of the community will be intact. It simply will be guided and limited to legitimate factors. Jurors already receive extensive instructions on punishment in capital cases, and on guilt or innocence in all cases. The additional burden is minimal when compared with the weight of the first two factors.

■ This Court concludes that the imposition of a life sentence in the circumstances of this case by a jury exercising standardless discretion violated the Eighth and Fourteenth Amendments to the Constitution of the United States. The Court is not unmindful of the contrary conclusion in *Moore v. Cowan,* 560 F.2d 1298, 1302 (6th Cir. 1977), *cert. denied,* 435 U.S. 929, 98 S.Ct. 1500, 55 L.Ed.2d 525, 436 U.S. 960, 98 S.Ct. 3079, 57 L.Ed.2d 1127 (1978), in which the Court said: "We must *assume* that the Kentucky juries considered the various alternatives before returning the sentence of life imprisonment without parole, and that their determinations were based on the facts before them in each case" (emphasis supplied). Such an assumption is not warranted in this kind of situation, where, as explained above, the burden that would be imposed on the State by requiring it to lay down standards to replace a mere assumption is so slight. With deference, this Court disagrees with *Moore.*

In doing so it is influenced by the reasoning of *Chaffin v. Stynchcombe,* 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973), which provides an interesting analogy. There, defendant's conviction had been set aside on a post-conviction review. He was tried and convicted again, and it became the responsibility of the jury (a different group of people from the jury which heard the first trial) to sentence him again. In an opinion by Mr. Justice Powell, the Supreme Court first observed that "this Court has never expressed doubt about the constitutionality" of jury sentencing. *Id.* at 22, 93 S.Ct. at 1980. With this proposition the petitioner there agreed. He argued, however, that "although the jury may set the sentence, its range of discretion must be subjected to limits similar to those imposed when the sentencing function on retrial is performed by the judge." *Ibid.*[3] Petitioner's contention was rejected on the ground that the second jury did not know about the prior conviction and therefore could not have been motivated by a desire to punish petitioner for exercising his right to apply for review of the first conviction. The Court specifically noted that the result might be otherwise if the jury did somehow know about the prior sentence. Then in a footnote, it indicated that petitioner would be entitled to some relief in that situation:

> We do not decide . . . whether improperly informing the jury [of the prior conviction or sentence] would always require limitation of the sentence [to a punishment no greater than that previously imposed] or whether such error might be

**3.** *Cf. North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), holding that when a conviction is set aside on application of the defendant, he may not, if retried and again convicted, be given a more severe sentence than he received the first time, unless the trial judge makes specific findings giving reasons, in order to exclude any possibility of vindictiveness.

cured by careful questioning of the jury venire or by a cautionary jury instruction. 412 U.S. at 28 n. 14, 93 S.Ct. at 1983. In other words, if there is a chance that the jury's verdict may have been influenced by a constitutionally impermissible motive, the defendant may be entitled, at the least, to cautionary instructions or inquiries from the Court. The implications of this reasoning in the present context are clear. Here, the jury was given a range of punishments from which to choose. It was given no guidance on how to make the choice. The petitioner's rights not to be sentenced on the basis of racial factors, and not to be subjected to a cruel and unusual punishment, were thus in jeopardy. Standards and explanatory instructions would substantially reduce the area of potential prejudice.[4]

The sentence imposed on petitioner was therefore unlawful under the Eighth and Fourteenth Amendments. The petition for habeas corpus will be granted, but petitioner is not thereby entitled to release. His conviction is valid, and he is lawfully confined. He will be entitled to release, however, on the expiration of 30 years from the date of his conviction, the minimum penalty prescribed by law for the crime of first-degree rape when this crime was committed.[5] If the State of Arkansas wishes to retry the issue of petitioner's punishment in order to seek a longer sentence, it may do so, but only if this new trial is conducted according to constitutionally permissible procedures, and only if it is commenced within 90 days.

This Court's opinion is not intended to cast any doubt on the constitutionality of jury sentencing, or on the validity of any other jury-imposed sentence. This Court holds only that the procedures given petitioner in this case, when considered in the context of the sentence imposed and the

other circumstances that have been noted, fell below the Plimsoll line of due process. It is with reluctance that this Court differs from the Supreme Court of Arkansas. That Court conscientiously interpreted and applied its view of the law to this case. This Court must do the same. Under the Act of Congress giving this Court jurisdiction to review the federal constitutional validity of the confinement of state prisoners, 28 U.S.C. § 2254, the duty cannot be avoided. The relief granted will keep interference with the State's administration of criminal justice to the minimum required to satisfy the Constitution of the United States.

Judgment is being entered accordingly.

---

**4.** The same result might be obtained by appellate review of sentences. See the excellent discussion of appellate review through the application of legislative standards in *State v. Sepulvado*, 367 So.2d 762 (La.1979). In the instant case the Supreme Court of Arkansas held appellate review was not available on the question of the excessiveness of a sentence on

the facts of an individual case. *Rogers v. State*, 265 Ark. 945, 958, 582 S.W.2d 7, 13 (1979).

**5.** Whether this reduction of petitioner's sentence would make him eligible for parole after ten years is a question of State law on which this Court expresses no view.